J-A26045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L.T., FATHER | : | |
| | : | |
| | : | No. 937 WDA 2024 |

Appeal from the Order Entered March 28, 2024
In the Court of Common Pleas of Butler County
Orphans' Court No. 44 of 2023

BEFORE: BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: November 14, 2024**

C.L.T. (Father) appeals from the order granting the petition of the Butler County Office of Children and Youth (Agency) and terminating his parental rights to A.M.T. (Child).[1]  We affirm.

*Background*

Child was born in August 2015 and was six years old when the court held the termination hearing.  The court recounted the following facts:

> Mother was not married at the time of Child's birth.  Father was present during Mother's pregnancy, but was incarcerated three months prior to Child's birth.  Father was released from incarceration for approximately one year between 2018 and 2019.  During this time period, Father made phone calls to Mother inquiring about Child, but he never spoke with Child or saw Child.  Father made no attempts to obtain custody through the legal system.

---

[1] The trial court also terminated the parental rights of N.R. (Mother), who has not appealed.

On November 22, 2019, Father was sentenced on multiple criminal offenses stemming from a May 31, 2019 incident. Father has continuously remained incarcerated on these offenses and has an anticipated release date in June of 2025. …

Child was initially detained on January 22, 2022, after it was reported to [the Agency] that Mother had been admitted to Butler Memorial Hospital psychiatric unit on a mental health commitment. No relatives were available to provide continued care for Child. It was reported that Father was incarcerated at the time. The only information that Mother could provide as to Father's whereabouts was that he was incarcerated somewhere in Pennsylvania.

An adjudication hearing was held on January 24, 2022, following which the [c]ourt found Child to be without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals.

Trial Court Opinion (TCO I), 3/28/24, at 2-3.

Shortly after the trial court adjudicated Child dependent, the Agency caseworker, Rachel Wetick, located Father at SCI Huntingdon. *Id.* at 3. The court explained:

Father participated in the April 7, 2022 family team meeting and [was] actively involved in the dependency proceedings thereafter. In Child's Permanency Plan, Father was tasked with (1) enrolling in programs available to him through his incarceration that would aid in him being reunified with Child; (2) remaining in contact with Child through sending letters, cards, pictures, etc.; and (3) [meeting] with [the Agency] caseworker upon his release from incarceration.

To his credit, Father completed a twelve-week parenting class at SCI Huntingdon and enrolled in counseling at the prison. Father initially sent letters to Child. … Father's letters ceased upon the initiation of supervised therapeutic visitation with Child.

As Father had never met Child, and Child was unaware of who his father was, it was determined that any visitation should be therapeutic in nature to build a relationship. Due to restrictions within SCI Huntingdon, it took some time to have video visitation

approved. Father's first visit occurred by video on October 2, 2022. Due to limitations established by SCI Huntingdon, visits were forty-five (45) minutes in duration and occurred every other week.

While some visits went well, with Child engaging with Father, in many visits Child preferred to engage in solo play, and complained that the visits were too long and that he was bored. Child would often act out following the video visitation and, therefore, visitation was coordinated to occur on the same day that Child met with his therapist.

Out of a total twenty-six (26) scheduled visits, twenty-one (21) visits took place. On three (3) occasions, Child appeared for the visit, [which] did not occur due to Father [or the prison] being in lockdown.

*Id.* at 3-4.

On August 25, 2023, the Agency petitioned to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). The trial court scheduled a hearing for January 12, 2024. On December 7, 2023,

with a termination hearing scheduled for the following month and Father having missed two (2) consecutive visits, the … request [of Child's counsel] to discontinue visitation was approved by the [c]ourt with the consent of all parties.

As Father's contact with Child throughout Child's entire life was limited to the twenty-one (21) video visits which were forty-five (45) minutes in length, wherein Child's engagement with Father was inconsistent at best, no bonding assessment was conducted. Any bond between Father and Child [wa]s minimal to non-existent. The two had never met in person until the day of the termination hearing[,] and the entirety of contact they had with one another throughout Child's life was limited to fifteen (15) hours and forty-five (45) minutes of video visitation, of which Child was largely disengaged and complained of the length and lack of interest in said visits.

*Id.* at 4-5.

The January 12, 2024 hearing was continued due to difficulty securing Father's appearance from prison. As a result, the trial court entered an order directing that Father be transported from SCI Huntington to Butler County. Order, 1/29/24. The termination hearing was held on March 1, 2024. On March 28, 2024, the trial court entered an order and accompanying opinion terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). With the trial court's permission, Father appealed *nunc pro tunc*.[2]

Father presents the following two issues for review:

> I. Did the lower court abuse its discretion, and err as a matter of law[,] as the … Agency failed to present clear and convincing evidence supporting termination of parental rights?
>
> II. Did the lower court err in determining it is in the Child's best interest to terminate Father's parental rights?

Father's Brief at 7.

## *Waiver*

We first address the trial court's contention that Father waived his issues because his concise statement fails to identify "the specific reason" the trial court "erred in finding clear and convincing evidence to support termination." TCO II at 2.

---

[2] The proper filing of the appeal was delayed due to missteps by prior counsel. **See** Father's Brief at 9 n.1. On July 31, 2024, the court entered an order appointing Father's current counsel, and directed counsel to file a petition to appeal *nunc pro tunc*. **See** Trial Court Opinion (TCO II), 8/12/24, at 1. Counsel complied, the court granted relief, and Father filed a notice of appeal with a concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises in his concise statement the same two issues he raises in his brief. *See* Concise Statement of Matters Complained of on Appeal, 8/1/24; Father's Brief at 7. Our Supreme Court has explained:

> The purpose of a Rule 1925(b) statement is to facilitate appellate review and to provide the parties and the public with the legal basis for a judicial decision. To this end, Rule 1925(b)(4)(ii) provides that the Rule 1925(b) statement "shall **concisely** identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). Highlighting this need for conciseness, Rule 1925(b)(4)(iv) indicates that the Rule 1925(b) statement "should not be redundant or provide lengthy explanations as to any error." Pa.R.A.P. 1925(b)(4)(iv). On the other hand, the Rule 1925(b) statement cannot be "too concise," as it must properly specify the errors to be addressed on appeal. … Pursuant to Rule 1925(b)(5)(vii), "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."
>
> To ensure that a Rule 1925(b) statement is both concise but also sufficiently detailed to identify all of the issues desired to be raised on appeal, Rule 1925(b)(4)(v) provides that "[e]ach error identified in the Statement will be deemed to include every **subsidiary issue** that was raised in the trial court[.]" Pa.R.A.P. 1925(b)(4)(v) (emphasis added).

*Commonwealth v. Price*, 284 A.3d 165, 170 (Pa. 2022) (some citations omitted). To be a "subsidiary issue,"

> the unstated issue must be "included" within the stated issue. Whether the unstated issue is fairly "included" within the stated issue depends in substantial part upon the interrelationship between the two issues – *i.e.*, whether resolution of the stated issue may depend, in whole or in part, upon the resolution of the unstated issue. In other words, the question is whether resolution of the two issues is sufficiently connected to each other such that the resolution of one may depend in some respect upon resolution of the other. This interrelationship typically occurs when the unstated issue is an element of, or important to, the broader stated issue.

*Id.* at 170–71 (footnote omitted).

Here, the two issues in Father's concise statement have an "interrelationship" and are "sufficiently connected" to the "subsidiary issues" he argues in his brief. *See* Father's Brief at 12-25 (arguing the trial court erroneously found clear and convincing evidence to support termination under 23 Pa.C.S. § 2511(a) and (b)).

In addition, the trial court advocates for waiver, but alternatively relies on "the reasons as stated" in its opinion accompanying the termination order. *See* TCO II at 2; TCO I at 8-16; *see also Commonwealth v. Arnold*, 284 A.3d 1262, 1269 n.9 (Pa. Super. 2022) (rejecting trial court's claim that appellant failed to preserve issue with specificity pursuant to Rule 1925(b), where "the court's alternative analysis on the merits demonstrates that it was well-aware of the nature and scope" of the argument); *Commonwealth v. Smyser*, 195 A.3d 912, 916 (Pa. Super. 2018) (declining to find waiver where trial court "readily apprehended" the issue).

Waiver is not required "in cases in which our ability to effectuate meaningful appellate review is not hindered." *Commonwealth v. Lawrence*, 313 A.3d 265, 283 (Pa. Super. 2024) (citation omitted). As our review is not hindered in this case, we consider whether Father's issues have merit.

### Arguments

Father argues the record "is clearly devoid of any clear and convincing evidence that the parental rights of Father should be terminated pursuant to

23 Pa.C.S. §[]2511(a)(1), (2), (5), and (8)." Father's Brief at 13. Father acknowledges that he is incarcerated, but claims "it remains unproven that someone with such a criminal record cannot be a proper parent and be permitted to raise his Child." *Id.* at 8, 12. According to Father, a "proper bond" can be formed, "given appropriate means to do so." *Id.*

> In contrast, the Agency argues:
>
> Given the length of time Child has been in placement … and credible evidence that Father was unable to make progress during that time to achieve reunification, the [t]rial [c]ourt did not err in terminating his parental rights.
>
> Child has a secure attachment to his foster family in whose home Child has thrived. Child deserves permanency, and given that Child has been in a safe and stable environment where Child's needs have been met on a consistent basis, the needs and well-being of Child were best met by termination of Father's parental rights.

Agency's Brief at 4-5.

Counsel for Child also argues termination "was appropriate[,] and adoption is the appropriate permanency option for [C]hild so that his needs and welfare will be met." Participant's Brief at 4.[3]

*Discussion*

We review the termination of parental rights for an abuse of discretion. *See In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). We must accept the findings of fact and credibility determinations of the trial court if they are

---

[3] The trial court determined there was no conflict with counsel serving as Child's guardian *ad litem* and legal counsel. *See* TCO I at 1 n.1.

supported by the record, and will reverse the trial court's decision "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision should not be reversed "merely because the record would support a different result." *Id.* at 827. We defer to trial courts because they "often have first-hand observations of the parties spanning multiple hearings." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted).

The Adoption Act provides statutory authority for the termination of parental rights. *See* 23 Pa.C.S. § 2511. The trial court must first determine whether the petitioner has established grounds for termination under Section 2511(a). The evidence must be clear and convincing. *See In re Adoption of S.P.,* 47 A.3d at 821–22. If the court finds grounds for termination under Section 2511(a), it must then consider the child's needs and welfare pursuant to Section 2511(b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the trial court's termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a) Grounds for Termination*

In his first issue, Father argues the Agency failed to present clear and convincing evidence of grounds for termination under Section 2511(a). As we need only agree with one subsection, we address Section 2511(a)(2), which provides for termination when:

The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Father claims the trial court relied "heavily, if not exclusively, on Father's incarceration," and that "[s]uch reliance is not proper." Father's Brief at 17. Father acknowledges he "was incarcerated the entirety of the proceedings concerning the Child and throughout most of Child's life." *Id.* at 12. In addressing Section 2511(a)(2), Father states:

> [F]rom the time Father was contacted and aware of the case, Father continued to make progress[,] including taking advantage of all the programs available in the prison he was housed, engaging in therapy, and being cooperative with [the Agency]. This is reflected in both the hearing reports and the testimony at the termination proceeding[, which] reflect that Father had completed a parenting program, was continuing therapy, and was participating in the video visits with his Child.
>
> … [O]ther than remaining incarcerated, which is a condition he cannot change, Father has engaged in every available service and cooperated with [the Agency]. No evidence was presented that [Father] will not remedy those conditions in a reasonable time and the services or assistance available will not remedy the conditions that led to removal. By the time termination was filed, … Father had completed parenting, was in therapy, and was regularly participating in visits. By all accounts, Father was doing all he could to engage the Child in visits and was only re[-]directed once[,] and based on that re-direction, maintained positive visits. None of the testimony or reports reflect that Father could not remedy the conditions[,] as clearly[] he had substantially progressed.

*Id.* at 19-20 (footnote omitted).

It is well-settled that incarceration "neither compels nor precludes termination." *In re Adoption of S.P.*, 47 A.3d at 828 (citation omitted). Rather,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2)[,] where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.*

Here, the trial court noted that "the first and only" time Father and Child saw one another in person was at the termination hearing, when Child "was briefly in the courtroom prior to being excused." TCO I at 2. The court found that "Father's actions directly caused his incarceration and inability to perform parental duties," noting that Father "was paroled in 2018, and violated parole by committing a new offense in 2019." *Id.* at 12. The court also found when Father was not incarcerated "for approximately one year between 2018 and 2019," he "made no attempts to obtain custody through the legal system." *Id.* The court concluded that because "Father is incarcerated and will be for the next fifteen months, his incapacity has caused Child to be without essential parental care, control or subsistence necessary for his physical and mental well-being[,] and this incapacity cannot be remedied by Father." *Id.* at 13. We discern no error.

Rachel Wetick testified to being the Agency caseworker for the family since the beginning of the case in February 2022. N.T., 3/1/24, at 83. At that

time, Father relayed that he had never lived with or parented Child. *Id.* at 106. Ms. Wetick testified that Father sent letters to Child at "the onset of the case." *Id.* at 91. In addition, Father completed a 12-week parenting class in prison, and "reported that he attends counseling in the facility and works on making positive choices." *Id.* at 91-92. Father advised Ms. Wetick that his "potential release date is in 2025." *Id.* at 93, 120. Ms. Wetick testified that Father has been unable to overcome the conditions which led to Child's dependency. *Id.* at 120.

Jamie Scherer testified to being a "family facilitator" for the Agency. *Id.* at 37-38. When Ms. Scherer first teleconferenced with Father and his attorney on April 7, 2022, Father acknowledged he had never met or lived with Child, who was six years old at the time. *Id.* at 39-40. Ms. Scherer described Father as being "enthusiastic" about participating in his family service plan (FSP). *Id.* at 41. The FSP directed Father to: (1) talk to his counselor about programs "available to him while incarcerated that would aid in his reunification" with Child; (2) maintain contact with Child by "sending cards, letters, or pictures"; and (3) upon release from prison, meet with the Agency to explore additional services. *Id.* Ms. Scherer recalled "significant difficulty" with arranging visitation for Father and Child at SCI Huntington. *Id.* at 42. She also recalled Father telling her that he expected to be released from prison "in 2025." *Id.* at 43.

Jessica Dickey, a "visitation supervisor" from Totin Family Services, testified that Father and Child had "therapeutic virtual visits." *Id.* at 54. Ms.

Dickey stated that Father and Child "were really just getting to know each other," and Child "wasn't aware of who [Father] was." *Id.* at 54-55.

Christina Totin, the owner of Totin Family Services, testified to facilitating therapeutic video visits between Father and Child. *Id.* at 67-68. Ms. Totin explained:

> A therapeutic component is to build relationship because [Child] was unaware of who his father was. They had no relationship. … So, we had some preliminary discussions with [Child] prior to having the first video visit. And I collaborated with [Child's] individual therapist as well[,] and we had decided that we were just going to refer to [Father by his first name] at the beginning[,] and as time progressed we would introduce him as being [Child's] dad.

> ***

> So, as time progressed and I felt as though [Child] was becoming more comfortable, we would engage in a game and [Child] would play against [Father,] but I would move [Father's] pieces to try to get them to engage.

*Id.* at 68, 70.

Ms. Totin explained that Child would come to her office on Tuesday mornings, and the visits would last for 45 minutes. *Id.* at 69. She noted Father "would often talk to [Child] about his behaviors and that he wanted him to make the right choices." *Id.* After the visits, Ms. Totin would drive Child to school, and "kind of wrap up and talk … for [Child] to have a little bit of a better understanding." *Id.* at 71.

Ms. Totin stated:

> There were a total of 26 scheduled visits … and [Father] attended 21 of those. There were three visits [when Child came] to the office … and [Father] did not sign on. I later learned from [the

- 12 -

> Agency caseworker] that one time the prison was on lockdown[,] and two of those times [Father] was in lockdown and unable to have the [video visit] privilege.

*Id.* at 73.

Ms. Totin said that sometimes Child "would have a really good visit where he was engaging with [Father] throughout the visit[,] and there were other times where [Child] would just want to solo play with toys." *Id.* at 74. She testified that the last video visit occurred on October 12, 2023, and she learned on December 7, 2023, that visits "had ended per request of the attorneys … based on [Father] not being available." *Id.* at 73, 77.[4]

Father confirmed he saw Child in person for the first time at the March 1, 2024 termination hearing, and that he would be incarcerated until June 2025. *Id.* at 130, 139. Father emphasized he "was doing the best [he] can" while incarcerated. *Id.* at 133. He also expressed his desire to parent Child, and requested "additional time and continued visitations." *Id.* at 134.

At the conclusion of the hearing, the trial court expressed its determination that the Agency had proven grounds for termination under Section 2511(a)(2). *See id.* at 149. The court explained to Father:

> I recognize that you've done everything that you could do while you were incarcerated. And I'm not pointing this out to hurt your feelings or anything, but the fact of the matter is, with these

_____

[4] Ms. Wetick testified that Child was having "some outbursts at school" and "behaviors in the foster home[,] and we were scheduled to have the termination hearing in January. So, at that time, there was an email between the attorneys and the guardian *ad litem*, … and it was decided that the visits would stop." N.T. at 94.

[virtual] visits, you've had less than 16 hours of contact with [Child] throughout his entire life.

And you've never parented him. And you're not currently in a position to parent him at this time. And the law is very clear that [Child] can not [*sic*] wait around for a more convenient time when you may be able to parent him in the future.

***Id.***

The trial court did not abuse its discretion, as the record supports a finding that Father's "repeated and continued incapacity … has caused [C]hild to be without essential parental care, control or subsistence necessary for his physical or mental well-being[,] and the conditions and causes of the incapacity, … cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); ***see also In re Adoption of C.M.***, 255 A.3d 343, 364 (Pa. 2021) (repeating that parental rights "are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs") (citations omitted).

*Section 2511(b) Needs and Welfare*

In his second issue, Father argues the trial court erred in determining it is in Child's best interest to terminate Father's parental rights. Father's Brief at 23. Father asserts "there is no evidence that Father cannot meet [Child's] needs and welfare," and seeks "to keep this matter going further until Father's impending release from prison." Father's Brief at 13.

After finding grounds for termination under Section 2511(a), the court "shall give primary consideration to the developmental, physical and

emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Our Supreme Court has explained:

> [T]he determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. … [T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

***Int. of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023) (citations and quotation marks omitted). Notably, the court "should consider the matter from the child's perspective, placing h[is] developmental, physical, and emotional needs and welfare above concerns for the parent." ***Id.***

In this case, the trial court observed:

> Child has been residing with his pre-adoptive foster family since October 17, 2023. The placement is stable and Child enjoys a sibling relationship with [a foster brother] in the home. The home has adequate space and Child enjoys sharing a bedroom with his foster brother, who is of a similar age.
>
> Child and his foster family exchange appropriate and healthy affections, and Child seeks support and comfort from his foster parents. The foster family is supporting Child in his weekly therapy, medication management, and extracurricular activities. The foster parents are working on developing an IEP and establishing tutoring sessions for Child. Following multiple

disruptions in placement in other foster homes, Child has finally found a family in which he is well integrated.

TCO I at 7-8. The record supports the court's reasoning.

The Agency caseworker, Ms. Wetick, testified to conducting home visits. N.T. at 101. She stated:

[Child] is engaged with everybody in the home. The home is safe and appropriate. [Child] is treated like part of the family. He interacts well with the other child[, who] is the same age as him. They do have sibling issues but typical. The family [is] very loving, makes sure that [Child] has all services that he needs, and he participates in activities, too.

*Id.* Ms. Wetick also confirmed that the placement is "a pre-adoptive home." *Id.* at 102.

Amanda Wilbur, a case manager at Bethany Christian Services, testified that she began working with Child and his pre-adoptive foster family after Child was placed with the family in October 2023. *Id.* at 57, 60. Although the placement is confidential, Ms. Wilbur described the family as including "foster father, foster mother, and a foster brother who is the same age as [Child]. And one dog." *Id.* at 57-58. She stated that there are four bedrooms in the home, but Child "prefers to share his bedroom with his foster brother." *Id.* at 58.

Ms. Wilbur said she "conducted ten foster home visits since [Child] was placed in October of [20]23." *Id.* at 63. Ms. Wilbur observed "appropriate and healthy interactions," and described "love and affection between [Child] and his foster parents." *Id.* at 58. She further described the foster parents as "proactive" in meeting Child's needs, stating:

[Child] receives therapy weekly. He receives medication management once every couple months. He just finished basketball season. He's interested in playing baseball or soccer coming up. He enjoys tinkering on the piano. …

His math and reading grades are a little low. The foster family is being proactive in finding tutoring or investigating an IEP to help with those grades.

*Id.* at 59. Ms. Wilbur added:

When I first met [Child], he was fairly quiet[,] and now he is energetic and I believe loves his foster family and his foster brother and has been incorporated into extended family member activities and community activities and enjoys where he's at.

*Id.* at 60.

With respect to Father, Ms. Wilbur stated that Child did not mention Father "at my home visits," but noted the foster family "encouraged [Child] to attend the virtual visits with [F]ather when they were occurring." *Id.* at 61-62.

Ms. Totin, who facilitated Child's video visits with Father, opined that Child did not benefit from the visits. She stated, "I think because there wasn't a relationship prior to [the Agency's involvement], I'm not sure that [Child] was able to get anything out of those visits." *Id.* at 79.

In closing, the Agency's counsel observed that "a little more than 24 months" had passed since Child was adjudicated dependent. *Id.* at 143. Counsel noted the stability of the pre-adoptive foster home in asserting that "discontinu[ance of Child's] involvement with the court system serves the best interest and welfare of [Child]." *Id.* The trial court subsequently concluded that "to the extent that any bond does exist between [Father] and [Child],"

termination is "in [Child's] best interest … so that he can be available for adoption and achieve permanency." *Id.* at 149.

Again, we discern no abuse of discretion. The record supports the trial court's finding that termination serves Child's needs and welfare. ***See Int. of K.T.***, 296 A.3d at 1106 (repeating that the court must consider intangible needs "such as love, comfort, security, and stability," and whether child is "in a pre-adoptive home and [has] a bond with their foster parents").

For the above reasons, we affirm the order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/14/2024